IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DON RALPH ICKES,                          )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )        CIVIL ACTION NO. 09-37J
                                          )
BOROUGH OF BEDFORD,                       )        JUDGE GIBSON
RICHARD DEAN KENSINGER, JR.,              )
Individually and in his Official Capacity )
as a Bedford Borough Police Officer,      )
DEPUTY TROY NELSON, Individually )
and in his Official Capacity as a Bedford )
County Sheriff's Deputy, SHERIFF C. G. )
REICHELDERFER, Individually and in )
his Official Capacity as Bedford County )
Sheriff, and DEPUTY LUKE BURKEY, )
Individually and in his Official Capacity )
as a Bedford County Sheriff's Deputy,     )
                                          )
        Defendants.                       )

MEMORANDUM OPINION AND ORDER OF COURT

GIBSON, J.

I. SYNOPSIS

This matter comes before the Court on motions for summary judgment filed by the

Defendants on June 1, 2010, and April 11, 2011. ECF Nos. 39, 40 & 84. For the reasons that

follow, those motions will be granted.

II. BACKGROUND

Plaintiff Don Ralph Ickes ("Ickes") arrived at the Bedford County Courthouse at

approximately 1:20 P.M. on February 13, 2008. ECF Nos. 43 & 49 at ¶ 1. He was carrying a

tape recorder when he entered the facility. *Id.* at ¶ 2. Ickes intended to conduct legal research in

the courthouse library and pick up papers from the Prothonotary's Office relating to a lawsuit in

which he was a party. *Id.* at ¶ 3. After entering the courthouse, Ickes proceeded in the direction of the law library. *Id.* at ¶ 4. When Ickes approached the law library, Bedford County employees Charlie Roberts ("Roberts") and Matt Diehl ("Diehl") told him that he could not enter. *Id.* at ¶ 5. Ickes started to walk up a ramp to enter a different area of the courthouse, but he stopped after learning from Roberts and Diehl that the ramp would lead him to a restricted area. *Id.* at ¶ 6.

After speaking with Roberts and Diehl, Ickes walked down a flight of stairs, entered the Prothonotary's Office, and procured the documents that he needed. *Id.* at ¶¶ 7-8. An employee of the Prothonotary's Office noticed that Ickes was carrying a tape recorder and called the matter to the attention of Deputy Sheriff Luke Burkey ("Burkey"). *Id.* at ¶ 9. Burkey went directly to the Sheriff's Office and relayed the information about Ickes' tape recorder to Deputy Sheriff Troy Nelson ("Nelson"). *Id.* at ¶ 10. Sheriff Charwin Reichelderfer ("Reichelderfer") was quickly made aware of the situation. *Id.* at ¶ 11. Meanwhile, Ickes left the Prothonotary's Office and entered the Tax Assessment Office with his tape recorder set on the "record" mode. *Id.* at ¶ 13.

Reichelderfer contacted the Bedford Borough Police Department and reported that Ickes was actively violating Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("Wiretap Act") [18 PA. CONS. STAT. § 5701 *et seq.*]. *Id.* at ¶ 15. Richard Dean Kinsinger, Jr. ("Kinsinger"),[1] a police officer employed by the Borough of Bedford ("Bedford"), learned from Reichelderfer that Ickes had been seen in the Prothonotary's Office with a tape recorder. *Id.* at ¶ 18. Kinsinger arrived at the courthouse and asked Burkey to identify Ickes. *Id.* at ¶ 19. Burkey, who was standing about fifty feet away from Ickes, pointed him out to Kinsinger. *Id.* at ¶ 20.

---

[1] Kinsinger's last name is misspelled in the caption because Ickes misspelled it when he filed his original and amended complaints. ECF Nos. 1, 15 & 39.

Kinsinger sought Burkey's assistance before interacting with Ickes, but Burkey advised that he was on "court duty" and could not remain in the area. *Id.* at ¶ 21. After assuring Kinsinger that he would ask somebody else to help, Burkey spoke with Nelson, who agreed to provide the needed assistance. *Id.* at ¶¶ 23-24.

Kinsinger approached Ickes inside of the Tax Assessment Office. *Id.* at ¶ 26. Ickes' tape recorder was set on the "record" mode at the time of the encounter. *Id.* at ¶ 27. In an attempt to avoid disruptions within the Tax Assessment Office, Kinsinger asked Ickes to step outside. *Id.* at ¶ 28. Ickes followed Kinsinger out into a hallway. *Id.* at ¶ 29.

Kinsinger suggested to Ickes that the recording of conversations within the courthouse constituted a violation of the Wiretap Act.[2] *Id.* at ¶ 30. Ickes expressed the view that his use of the tape recorder was not illegal. *Id.* at ¶ 32. Kinsinger verbally refuted Ickes' contention that his conduct was lawful. *Id.* at ¶ 33. The tape recorder continued to operate during the course of this conversation. *Id.* at ¶ 35. Ickes asked whether he was under arrest. *Id.* at ¶ 36. Kinsinger responded by informing Ickes that he could be placed under arrest if he did not turn off the tape recorder. *Id.* at ¶ 37. Kinsinger repeatedly told Ickes that he needed to turn the tape recorder off. *Id.* at ¶ 38. Ickes asked whether Kinsinger wanted to discuss the matter. *Id.* at ¶ 41. At that point, Kinsinger told Ickes that he was under arrest.[3] *Id.* at ¶ 42.

Ickes started to move away from Kinsinger. *Id.* at ¶ 43. Kinsinger responded by placing his hand on Ickes' left forearm.[4] *Id.* at ¶ 44. Ickes pulled his arms close to his torso. *Id.* at ¶ 45. Kinsinger reiterated that Ickes was under arrest. *Id.* at ¶ 46. Ickes resisted Kinsinger's request

---

[2] Under Pennsylvania law, a person is guilty of a third-degree felony if he or she "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication . . . ." 18 PA. CONS. STAT. § 5703(1).
[3] Ickes alleges that he expressed an intention to leave the courthouse before being told that he was under arrest. ECF No. 49 at ¶ 17.
[4] Ickes claims that Kinsinger "grabbed" his forearm. ECF No. 49 at ¶ 44.

3

that he put his hands behind his back and tried to prevent Kinsinger from turning off the tape recorder. *Id.* at ¶ 47. While Kinsinger attempted to complete the arrest, Ickes twisted his body in an effort to get away. *Id.* at ¶ 48. Kinsinger warned Ickes that he would be tasered[5] if he continued to resist the arrest. *Id.* at ¶ 61; ECF No. 52 at ¶ 24. Ickes replied, "Go ahead and taser me." ECF Nos. 43 & 49 at ¶ 62. He also asked Kinsinger to justify the arrest by identifying the source of his "probable cause." *Id.* at ¶ 64. When Ickes tried to get away again, Kinsinger deployed the taser. *Id.* at ¶¶ 65-66; ECF No. 52 at ¶ 26. One taser dart hit Ickes' left shoulder, while the other one impacted his leather jacket. ECF Nos. 43 & 49 at ¶ 70. Ickes experienced a "mild shock," causing him to drop his tape recorder and a manila folder on the floor. *Id.* at ¶¶ 68-69. He tried to retreat from Kinsinger's presence. *Id.* at ¶ 73. Kinsinger deployed the taser again, and Ickes fell to the floor. *Id.* at ¶¶ 74-75. At some point, Nelson arrived on the scene and provided assistance. *Id.* at ¶¶ 76, 79. Ickes was placed in handcuffs, searched, and taken into custody. *Id.* at ¶ 79. Two folding knives were found in his pocket. *Id.* at ¶ 80. The taser darts were removed from Ickes' body. *Id.* at ¶ 81. The tape recorder, manila folder and folding knives were collected and retained for evidentiary purposes. *Id.*

Kinsinger transported Ickes to the Bedford Borough Police Station. *Id.* at ¶ 82. Ickes was charged with disorderly conduct,[6] resisting arrest,[7] and violations of the Wiretap Act.[8] *Id.* at ¶ 84. Although the charges arising under the Wiretap Act were dismissed by a District Justice, they were ultimately refiled by the District Attorney. *Id.* at ¶ 85. Ickes commenced this action against Kinsinger and Bedford on February 17, 2009, alleging violations of the Fourth and

---

[5] The applicable Bedford policy defines the term "taser" as "[a] weapon designed to disrupt a subject's central nervous system by deploying battery-powered electrical energy efficient to cause uncontrolled muscle contractions and override voluntary motor responses." ECF No. 39-16 at 1. When employed as a verb, the term "taser" essentially refers to one's use of the defined weapon.

[6] 18 PA. CONS. STAT. § 5503.

[7] 18 PA. CONS. STAT. § 5104.

[8] 18 PA. CONS. STAT. § 5703.

Fourteenth Amendments to the United States Constitution. ECF No. 1. Meanwhile, the criminal charges against Ickes proceeded in the Pennsylvania courts. The Court of Common Pleas of Bedford County dismissed the charges arising under the Wiretap Act in an order dated May 11, 2009. ECF Nos. 43 & 49 at ¶ 86. Ickes filed an amended complaint in this action on August 7, 2009, adding Nelson, Reichelderfer and Burkey as defendants. ECF No. 15. After a bench trial conducted in the Court of Common Pleas during the fall of 2009, Ickes was convicted of disorderly conduct.[9] ECF Nos. 43 & 49 at ¶ 87.

Kinsinger and Bedford filed a motion for summary judgment on June 1, 2010. ECF No. 39. That same day, a separate motion for summary judgment was filed by Nelson, Reichelderfer and Burkey. ECF No. 40. On June 2, 2010, Ickes sought leave to amend his complaint, claiming that the Defendants had violated his rights under the First Amendment. ECF No. 51. Finding Ickes' attempt to assert First Amendment claims to be "extremely untimely," the Court denied the motion for leave to amend in a memorandum opinion and order dated December 3, 2010. ECF No. 76 at 5. Kinsinger and Bedford filed a supplemental motion for summary judgment on April 11, 2011. ECF No. 84. The motions for summary judgment filed by the Defendants are the subject of this memorandum opinion. ECF Nos. 39, 40 & 84.

### III. SUMMARY JUDGMENT STANDARDS

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

---

[9] Ickes testified that the resisting arrest charge had been "dropped" by the District Attorney prior to the trial. ECF No. 39-3 at 29; Ickes Dep. at 113.

trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories in order to show that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV. JURISDICTION AND VENUE

Jurisdiction in this case is predicated on 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b).

## V. DISCUSSION

Ickes brings his federal constitutional claims pursuant to 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or

6

usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983. This statutory provision does not create substantive rights. *Maher v. Gagne*, 448 U.S. 122, 129, n. 11, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). A plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of a federal constitutional or statutory right. *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).

In order to determine whether Ickes' claims under § 1983 are viable, the Court must "identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 841, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Ickes' claims arise under the Fourth Amendment, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST., AMEND. IV. The provisions of the Fourth Amendment are applicable to the States by virtue of the Fourteenth Amendment's Due Process Clause. *Cady v. Dombrowski*, 413 U.S. 433, 440, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). "A Fourth Amendment 'seizure' occurs when there is a governmental termination of movement through means intentionally applied." *Thompson v. Wagner*, 631 F.Supp.2d 664, 672 (W.D.Pa. 2008)(citing *Brower v. County of Inyo*, 489 U.S. 593, 597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)). It is undisputed that Ickes was "seized" at the time of his arrest. Since the Fourth Amendment prohibits only "unreasonable"

seizures, the "pivotal question" in this case is whether the arrest at issue was reasonable. *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999).

In the amended complaint, Ickes purports to challenge both Kinsinger's decision to effectuate the arrest and the manner in which the arrest was carried out. ECF No. 15 at ¶¶ 30-31. Specifically, Ickes alleges that Kinsinger arrested him "without probable cause," and that "unnecessary and excessive force" was employed during the course of the arrest. *Id.* He also claims that Bedford, Nelson, Reichelderfer and Burkey are liable under § 1983 for their respective roles in the incident. *Id.* at ¶¶ 36-74.

## A.    The False Arrest Claims

The Fourth Amendment permits an arrest to be made only on the basis of "probable cause." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995). In order for an arrest to be lawful, "[p]robable cause need only exist as to any offense that could be charged under the circumstances." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994).

At the time of his arrest, Ickes was charged with disorderly conduct, resisting arrest and violations of the Wiretap Act. ECF Nos. 43 & 49 at ¶ 84. The Court of Common Pleas dismissed the charges arising under the Wiretap Act in an order dated May 11, 2009. ECF No. 39-13. The resisting arrest charge was evidently dropped by the District Attorney. ECF No. 39-3 at 29; Ickes Dep. at 113. Ickes was ultimately convicted of disorderly conduct. ECF Nos. 43 & 49 at ¶ 87.

All of the criminal charges filed against Ickes were based on his encounter with Kinsinger. Since Ickes was convicted of disorderly conduct, the Defendants argue that his challenge to the lawfulness of the arrest cannot proceed. ECF No. 44 at 4-5; ECF No. 85 at 3-5. They base their argument on *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), in which the United States Supreme Court declared:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.

*Heck*, 512 U.S. at 486-487 (footnote omitted; emphasis in original). The Defendants contend that, under *Heck*, the disorderly conduct conviction precludes Ickes from pursuing claims based on the alleged unlawfulness of his arrest. ECF No. 44 at 4-5; ECF No. 85 at 3-5.

Ickes makes no attempt to refute the argument advanced by the Defendants. In an affidavit dated June 28, 2010, he stated that his conviction was pending on appeal. ECF No. 47-19 at ¶ 7. In his brief, Ickes "acknowledges" that he cannot challenge the constitutionality of his arrest unless the conviction is overturned. ECF No. 47 at 3. He consents to the dismissal of his false arrest claims "without prejudice." *Id.*

The parties are correct in their view that *Heck* requires the dismissal of any claims that would impugn Ickes' conviction. *Wallace v. Kato*, 549 U.S. 384, 394, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). It is also true that an arrest supported by probable cause with respect to a particular charge remains lawful even if probable cause is lacking with respect to a different charge. *Edwards v. City of Philadelphia*, 860 F.2d 568, 575-576 (3d Cir. 1988). The problem in

this case, however, is that the disorderly conduct charge may have stemmed from "conduct" occurring *after* Ickes had already been placed under arrest. In an expert report dated March 30, 2011, Clifford W. Jobe, Jr. ("Jobe"), opined that Ickes' "defiant resistance" to Kinsinger's "attempt to place him under arrest was unreasonable and illegal," thereby triggering the disorderly conduct and resisting arrest charges. ECF No. 86-1 at 6, ¶ 35. If Ickes was already under arrest when he engaged in "disorderly conduct," a determination that the initial arrest was illegal would not "necessarily imply the invalidity of his conviction or sentence" for subsequent conduct. *Heck*, 512 U.S. at 487. This issue cannot be conclusively resolved without reference to the record of the criminal proceedings and the specific actions justifying Ickes' conviction.

Since Ickes affirmatively consents to the dismissal of his false arrest claims, the Defendants' motions for summary judgment will be granted within the parameters of that consent.[10] ECF No. 47 at 3. The Defendants argue that the false arrest claims should be dismissed "with prejudice." ECF No. 85 at 3-5. Nevertheless, they make no attempt to demonstrate that, under the particular circumstances of this case, a determination in favor of Ickes would "*necessarily* imply the invalidity of his conviction or sentence" for disorderly conduct. *Heck*, 512 U.S. at 487 (emphasis added). For this reason, Ickes' false arrest claims will be dismissed "without prejudice." ECF No. 47 at 3. In light of Ickes' concession, the Court's analysis will proceed on the assumption that Kinsinger had probable cause to make the arrest.

## B.      The Excessive Force Claim Against Kinsinger

The "reasonableness" of a seizure supported by probable cause depends on "how it is carried out." *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). "In

---

[10] Because Ickes consents to the dismissal of his false arrest claims, the Court has no occasion to consider whether Kinsinger had probable cause to arrest Ickes for violating the Wiretap Act. Nonetheless, the mere fact that the Wiretap Act charges were dismissed does not mean that probable cause was lacking. *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994)("Evidence that may prove insufficient to establish guilt at trial may still be sufficient to find the arrest occurred within the bounds of the law.").

determining the reasonableness of the manner in which a seizure is effected, '[a court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Scott v. Harris*, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)(quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)). The "proper application" of this standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In every case of this kind, the dispositive question is "whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force," and "an officer's good intentions" will not "make an objectively unreasonable use of force constitutional." *Id.*

The Supreme Court has explained that "§ 1983 is to be read in harmony with general principles of tort immunities rather than in derogation of them." *Imbler v. Pachtman*, 424 U.S. 409, 418, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). For this reason, the "qualified immunity" that was available to executive officials at common law may be invoked by executive officials sued under § 1983. *Hafer v. Melo*, 502 U.S. 21, 28-29, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). In this vein, state officials performing discretionary duties are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In order for a federal right to be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Qualified immunity is not only a defense to liability, but also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Consequently, the Supreme Court has often "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)(*per curiam*).

In *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court held that a federal court considering whether a defendant was entitled to qualified immunity had to decide the "threshold question" of whether the plaintiff could demonstrate that the defendant's actions were violative of a federal constitutional or statutory right before determining whether that right was "clearly established." The purpose of this rule was to facilitate "the law's elaboration from case to case." *Saucier*, 533 U.S. at 201. In *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), the Supreme Court retreated from the mandatory nature of the *Saucier* framework, instructing federal courts to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." The flexible rule established in *Pearson* serves to promote the economical disposition of "cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 237.

Having reviewed the record in its entirety, the Court is convinced that Kinsinger is clearly entitled to qualified immunity even if it is assumed that he violated Ickes' rights under the Fourth Amendment. This area of the law "is one in which the result depends very much on the facts of each case." *Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)(*per curiam*). Even when the facts are viewed in the light most favorable to Ickes, it cannot be said that the state of the law "clearly established" that the actions taken by Kinsinger were unconstitutional.

Several witnesses to the altercation between Kinsinger and Ickes were deposed during the course of discovery. Kinsinger testified that Ickes had actively resisted the arrest. ECF No. 39-7 at 20; Kinsinger Dep. at 79-80. When questioned about the incident, Kinsinger stated that his right hand had hit the courthouse wall while he was trying to place Ickes under arrest, causing it to go numb. ECF No. 39-7 at 21; Kinsinger Dep. at 82-83. Kinsinger indicated that he had warned Ickes that continued resistance to the arrest would result in the use of the taser, and that Ickes had replied, "Go ahead and taser me." *Id.* Kinsinger explained that the taser's electrical circuit had not properly connected on the first impact, thereby necessitating a second deployment to effectuate Ickes' arrest. ECF No. 39-7 at 22-24; Kinsinger Dep. at 88-93. Nelson apparently arrived on the scene while Ickes was being tasered. Kinsinger testified that he had not been aware of Nelson's presence until after the taser had already been used for the second time. ECF No. 39-7 at 24; Kinsinger Dep. at 95-96.

Nelson testified that Ickes had been trying to "arm bar" Kinsinger in an attempt to evade detention. ECF No. 39-5 at 6; Nelson Dep. at 23. Like Kinsinger, Nelson stated that Ickes had replied, "Go ahead and taser me" after being warned that the taser would be used. ECF No. 39-5 at 7; Nelson Dep. at 26. Nelson recalled seeing only one deployment of the taser during the

course of the altercation. ECF No. 39-5 at 8; Nelson Dep. at 31. He acknowledged that he had not announced his presence to Kinsinger prior to the deployment of the taser. ECF No. 39-5 at 7-8; Nelson Dep. at 28-29.

Two other witnesses corroborated the testimony provided by Kinsinger and Nelson concerning Ickes' resistance to the arrest. Robin C. Stayer ("Stayer") testified that Ickes had refused to let go of the tape recorder, and that Kinsinger had struggled with Ickes to get his arms behind his back. ECF No. 39-10 at 4; Stayer Dep. at 13. In a statement dated February 13, 2008, Kenneth R. Corrie ("Corrie") declared that Ickes had "pushed" Kinsinger's hand away and "stepped away from" Kinsinger after being told that he was under arrest. ECF No. 39-9 at 13. Corrie subsequently testified that Kinsinger had deployed the taser only once during the course of his encounter with Ickes. ECF No. 39-9 at 4; Corrie Dep. at 15.

Ickes testified that Kinsinger had announced his intention to use the taser before deploying it. ECF No. 39-3 at 13; Ickes Dep. at 51-52. In his affidavit, Ickes denied that he had tried to "arm bar" Kinsinger. ECF No. 47-19 at 2, ¶ 4. Nonetheless, he acknowledged that he had "pulled away" from Kinsinger while being placed under arrest. *Id.* at 1, ¶ 2. Ickes stated that he had been run over by a tractor on August 16, 1997, and that he had been suffering from residual injuries stemming from that accident. *Id.* at 1, ¶¶ 2-3. He claims that his aversion to having his hands placed behind his back was simply a reaction designed to avoid the aggravation of preexisting injuries. ECF No. 47 at 4.

The tape recorder carried by Ickes at the time of his arrest recorded a portion of the conversation between Ickes and Kinsinger. A transcribed record of the audio recording is contained in the record. ECF No. 47-2. The relevant portion of the transcript reads as follows:

> Officer Kinsinger:   Don? I'm Officer Kinsinger [sic] can I talk to you outside
> for a minute?

| | |
|---|---|
| Officer Kinsinger: | I got a couple of calls from some people that got concerned that you were walking around with a tape recorder. |
| Ickes: | Um. |
| Officer Kinsinger: | Do you know that you are actually in violation of the wiretap act? |
| Ickes: | I don't think so. |
| Officer Kinsinger: | Well you are. |
| Ickes: | Oh really. |
| Officer Kinsinger: | (inaudible) . . . record someone's conversation. |
| Ickes: | (inaudible) . . . Well ok [sic], am I under arrest? |
| Officer Kinsinger: | You can be, [sic] you need to shut your tape recorder off. |
| Ickes: | Is that all you have to say to me? |
| Officer Kinsinger: | That's not all. |
| Ickes: | Well then uh . . . . |
| Officer Kinsinger: | I am making a request right now for you to turn that tape recorder off. |
| Ickes: | Am I under arrest? |
| Officer Kinsinger: | I am making a request right now for you to turn your tape recorder off. |
| Ickes: | You wanna [sic] talk to me. |
| Officer Kinsinger: | I'm telling you right now to turn your tape recorder off. |
| Ickes: | Well, I'm gonna [sic] leave. |
| Officer Kinsinger: | No sir. Listen to me, [sic] you're in violation of the wiretap act. |
| Ickes: | Listen, what are you doing to me? |

| Officer Kinsinger: | You're under arrest. |
|---|---|
| Ickes: | For what? |
| Officer Kinsinger: | Put your hands behind your back. |
| Ickes: | No sir [sic] be careful, I'm a handicapped person. |
| Officer Kinsinger: | I will tase you, put your hands behind your back. |
| Ickes: | Then go ahead [sic] tase me. |
| Officer Kinsinger: | Put your hands behind your back. |
| Ickes: | I need to go see my attorney. |

*Id.* at 2-3. Like the testimony provided by multiple witnesses, the transcript suggests that Ickes was resistant to the idea of being placed under arrest, and that he was warned that the taser would be used if he did not cooperate.

In an expert report dated June 21, 2010, Dr. R. Paul McCauley faulted Nelson for failing to verbally inform Kinsinger of his presence and location. ECF No. 47-20 at 12. Dr. McCauley opined that Kinsinger and Nelson would have been able to subdue Ickes without using the taser, and that Kinsinger's deployment of the taser had constituted "unnecessary, unreasonable, and excessive force." *Id.* This observation was partially based on the fact that Ickes was seventy-two years old at the time of his arrest. *Id.*

Kinsinger testified that he had decided to use the taser because he could no longer use his right hand to effectuate the arrest.[11] ECF No. 39-7 at 21; Kinsinger Dep. at 83. He stated that he had been unsure as to whether anyone else was coming to assist him. ECF No. 39-7 at 22; Kinsinger Dep. at 87. According to Kinsinger, the taser had already been deployed by the time that he had realized that Nelson was available to help. ECF No. 39-7 at 24; Kinsinger Dep. at

---

[11] Corrie testified that Kinsinger's hand had slammed against the courthouse wall shortly before the taser was used. ECF No. 39-9 at 3; Corrie Dep. at 11-12.

95-96. In his report, Jobe described the use of the taser as "the most reasonable means" available to Kinsinger "to facilitate the application of handcuff restraints and control." ECF No. 86-1 at 16.

When viewed in the light most favorable to Ickes, the record suggests that Nelson's failure to alert Kinsinger to his presence at the scene may have resulted in the premature and unnecessary use of the taser. Nelson testified that he had been "within several feet of" Kinsinger immediately prior to the deployment of the taser, but that he had not spoken to Kinsinger until after the taser had already been used. ECF No. 39-5 at 7-8; Nelson Dep. at 28-29. This alleged breach of protocol, however, has no bearing on the constitutional analysis in this case. Although the particular practices of law enforcement entities may "vary from place to place and from time to time," the objective reasonableness of a police officer's actions under the Fourth Amendment does not "turn upon such trivialities." *Whren v. United States*, 517 U.S. 806, 815, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

In *Tennessee v. Garner*, 471 U.S. 1, 3, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Supreme Court held that a police officer's use of *deadly* force "to prevent the escape of an apparently unarmed felon" constitutes an "unreasonable" seizure within the meaning of the Fourth Amendment unless it is both "necessary to prevent the escape" and supported by "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Speaking through Justice White, the Supreme Court explained:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A

police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

*Garner*, 471 U.S. at 11. The holding in *Garner* was premised on the understanding that the Fourth Amendment's requirement of objective reasonableness accounts for both "the nature and quality of the intrusion" imposed on an individual's interests by a seizure and "the importance of the governmental interests alleged to justify the intrusion." *Scott*, 550 U.S. at 383; *Place*, 462 U.S. at 703. On balance, a government's generalized interest in enforcing its laws is simply not weighty enough to justify the use of *deadly* force to "seize" a fleeing felon. *Garner*, 471 U.S. at 7-12. Because "[t]he intrusiveness of a seizure [secured] by means of deadly force is unmatched," a seizure of that magnitude is "reasonable" only where it is necessary not only to prevent an individual's escape, but also to protect innocent bystanders from the "threat of death or serious physical injury." *Id.* at 3, 9.

A police officer's use of a taser does not ordinarily cause death or serious bodily injury.[12] Kinsinger testified that the Bedford Borough Police Department had issued tasers to its officers during the latter part of 2007. ECF No. 39-7 at 6; Kinsinger Dep. at 24. He stated that he had been tasered, at his own suggestion, as a part of his training. ECF No. 39-7 at 8; Kinsinger Dep. at 31-32. James C. Sigler ("Sigler"), Bedford's Chief of Police, testified that any officer who wanted to carry a taser was required to experience its deployment. ECF No. 39-15 at 9; Sigler Dep. at 35. He testified that a taser temporarily causes an individual to lose control of his or her muscles. ECF No. 39-15 at 3-4; Sigler Dep. at 12-13. Since Bedford requires officers who carry

---

[12] There are circumstances in which the use of a taser can be devastating to an individual. For instance, the tasering of a person "may result in serious injuries when intense pain and loss of muscle control cause a sudden and uncontrolled fall." *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010). The Fourth Amendment's standard of objective reasonableness accounts for all of the circumstances surrounding the particular seizure at issue. *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011)(explaining that the tragic, unforeseeable consequences of an officer's use of a taser does not render an otherwise reasonable seizure unconstitutional).

18

tasers to experience their effects firsthand, it cannot be reasonably argued that the deployment of a taser constitutes the use of "deadly" force akin to the kind condemned in *Garner*. Instead, the use of a taser is more appropriately characterized as "an intermediate or medium, though not insignificant, quantum of force that causes temporary pain and immobilization." *Sanders v. City of Fresno*, 551 F.Supp.2d 1149, 1168 (E.D.Cal. 2008).

Any use of force, however, "must be justified by the need for the specific level of force employed." *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010). "Force is reasonable only when exercised in proportion to the threat posed." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010). Regardless of whether force is properly characterized as deadly or non-lethal, the relevant question is whether it is "reasonable" under the precise circumstances confronted by the arresting officer. *Scott*, 550 U.S. at 383. This question must be considered from the perspective of an objectively reasonable officer at the scene of the arrest. *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004).

The evidence in this case overwhelmingly supports Kinsinger's contention that Ickes was actively resisting the arrest when the taser was deployed. This factor weighs in favor of a determination that Kinsinger's actions were reasonable. *Graham*, 490 U.S. at 396 (explaining that the inquiry as to objective reasonableness accounts for whether a suspect "is actively resisting arrest or attempting to evade arrest by flight"). Several federal courts have found it to be objectively reasonable for an arresting officer to use a taser in order to subdue a resisting suspect. *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011); *Woods v. Grant*, 665 F.Supp.2d 438, 446 (D.Del. 2009); *Wargo v. Municipality of Monroeville*, 646 F.Supp.2d 777, 786 (W.D.Pa. 2009); *Schumacher v. Halverson*, 467 F.Supp.2d 939, 951-952 (D.Minn. 2006). They have done so even in situations involving minor crimes and unarmed suspects. *McKenney*,

635 F.3d at 360 ("Although the charges were limited to misdemeanors, the officers executing the warrant were not required to let Barnes run free."); *Wargo*, 646 F.Supp.2d at 786 ("Even if a plaintiff is not armed, it is reasonable for law enforcement to employ multiple rounds of non-lethal force if necessary to effectuate an arrest."). The fact that Ickes persisted in his resistance after being warned that he would be tasered also weighs heavily in favor of Kinsinger's position. *Schumacher*, 467 F.Supp.2d at 951.

The record contains no evidence suggesting that Kinsinger used the taser after Ickes was already in handcuffs. The repeated use of a taser against a suspect who is no longer resisting arrest is constitutionally unreasonable. *Oliver v. Fiorino*, 586 F.3d 898, 905-908 (11th Cir. 2009); *Oliver v. City of Orlando*, 574 F.Supp.2d 1279, 1285-1287 (M.D.Fla. 2008); *Landis v. Cardoza*, 515 F.Supp.2d 809, 812-815 (E.D.Mich. 2007); *Wanbaugh v. Fields*, 508 F.Supp.2d 723, 729-730 (W.D.Ark. 2007); *Beaver v. City of Federal Way*, 507 F.Supp.2d 1137, 1144-1147 (W.D.Wash. 2007); *Batiste v. City of Beaumont*, 421 F.Supp.2d 1000, 1006 (E.D.Tex. 2006). In this case, however, nothing in the record indicates that Kinsinger deployed the taser beyond the degree necessary to take Ickes into custody. The Court does not understand Ickes to argue that Kinsinger had an ulterior motive for using the taser, or that the taser was deployed for some purpose other than to effectuate his arrest. *Brown v. City of Golden Valley*, 574 F.3d 491, 494-499 (8th Cir. 2009)(finding it to be unreasonable for a police officer to taser a passenger who had refused to terminate a telephone conversation with a 9-1-1 operator).

There are some factors which weigh in favor of Ickes' contention that the use of the taser was unreasonable. Although the deployment of a taser is not normally fatal, it remains a relatively serious use of force. *Jackson v. City of Gahanna*, 752 F.Supp.2d 830, 841 (S.D.Ohio 2010). Ickes testified that he had described himself as "handicapped" when Kinsinger was trying

to place his hands behind his back. ECF No. 39-3 at 12; Ickes Dep. at 47. This testimony was consistent with the transcript of the conversation. ECF No. 47-2 at 3. In his affidavit, Ickes attributed his physical resistance to the arrest to his preexisting injuries rather than to a desire to evade capture. ECF No. 47-19 at 1, ¶¶ 2-3. Burkey testified that he had informed Kinsinger that someone else would be sent to provide assistance. ECF No. 39-4 at 5; Burkey Dep. at 17. Had Kinsinger waited for Nelson to arrive, he may have been able to apprehend Ickes without using the taser. *Beaver*, 507 F.Supp.2d at 1145. Although two folding knives were found in Ickes' pocket, the record contains no evidence suggesting that they posed "a significant threat of death or serious physical injury to [Kinsinger] or others." *Garner*, 471 U.S. at 3.

While reasonable minds may differ as to whether the degree of force employed by Kinsinger was appropriate, it cannot be said that Kinsinger violated a "clearly established" constitutional right enjoyed by Ickes. Ickes correctly asserts that he "has a constitutional right to be free from excessive force." ECF No. 47 at 6. In order to overcome Kinsinger's qualified immunity, however, Ickes must do more than simply recite the "general proposition" that a police officer's "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier*, 533 U.S. at 201-202. The inquiry concerning qualified immunity "must be undertaken in light of the specific context of the case." *Id.* at 201. Ickes points to no decision of a federal appellate court holding that the Fourth Amendment prohibits a police officer from using a taser to subdue a suspect who is actively resisting arrest. ECF No. 47 at 5-7.

Bedford's taser policy specifically warns officers that there is "a greater potential for injury" when a taser is used against an "elderly" individual than there is when it is used against a younger adult. ECF No. 39-16 at 2. Ickes contends that Kinsinger's use of the taser to effectuate

his arrest constituted a violation of Bedford's policy. ECF No. 47 at 3-4. Contrary to Ickes' suggestion, the policy does not appear to *prohibit* the use of a taser against an "elderly" individual who is attempting to evade arrest. ECF No. 39-16 at 2. In any event, Kinsinger's alleged failure to conform his conduct to state or local law cannot defeat his entitlement to qualified immunity. *Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.")(footnote omitted). A plaintiff seeking redress for a violation of his or her constitutional or statutory rights may overcome a defendant's qualified immunity "only by showing that *those rights* were clearly established at the time of the conduct at issue."[13] *Id.* at 197 (emphasis added). The Fourth Amendment does not *itself* incorporate statutory and administrative mandates enacted by state and local entities. *Virginia v. Moore*, 553 U.S. 164, 168-178, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008). Therefore, Kinsinger did not violate a "clearly established" Fourth Amendment right even if it is assumed that he violated state or local law by tasering Ickes.

Although Ickes' status as a "handicapped" individual may have counseled against the deployment of the taser to effectuate his arrest, it is also possible that more "serious harm" to his health would have resulted had his "physical struggle" with Kinsinger been allowed to continue. *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004). It is undisputed that Ickes was warned that he would be tasered if he continued to resist the arrest, and that he responded by

---

[13] Ickes claims that Kinsinger's actions contravened the First Amendment. ECF No. 47 at 6. That allegation relates to whether the arrest was itself legal, irrespective of how it was carried out. The Court has no occasion to consider the legality of the arrest, since Ickes consents to the dismissal of his false arrest claims. ECF No. 47 at 3. Furthermore, the Court has already determined that Ickes cannot assert First Amendment claims at this late stage. ECF No. 76 at 3-7. Since Ickes' excessive force claims arise under the Fourth Amendment, Kinsinger's entitlement to qualified immunity does not turn on whether he violated some "clearly established" First Amendment right enjoyed by Ickes. In order to defeat a defendant's defense of qualified immunity, a plaintiff must establish a "clear violation" of the specific right that gives rise to his or her cause of action. *Davis v. Scherer*, 468 U.S. 183, 194, n. 12, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

verbally inviting Kinsinger to use the taser. ECF Nos. 43 & 49 at ¶ 62. Ickes' responsibility for creating the dangerous situation has some bearing on the reasonableness of Kinsinger's actions. *Scott*, 550 U.S. at 384, n. 10. In light of Ickes' conscious refusal to submit to the arrest, Kinsinger had every reason to believe (rightly or wrongly) that the use of the taser was reasonable. *Schumacher*, 467 F.Supp.2d at 951-952. Since Kinsinger is obviously entitled to qualified immunity, the Court need not decide the more difficult question of whether the "seizure" at issue was "unreasonable" under the Fourth Amendment. *Pearson*, 555 U.S. at 236-237.

### C.     The Claim Against Bedford

Bedford is a "person" subject to suit under § 1983. *Monell v. Dept. of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Unlike a personal-capacity defendant, a governmental entity "may not assert the good faith of its officers or agents as a defense to liability." *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Kinsinger's entitlement to qualified immunity has no bearing on Bedford's liability in this action.[14] *Hafer*, 502 U.S. at 25. In determining whether Bedford is liable for violating Ickes' Fourth Amendment rights, the Court will assume *arguendo* that Kinsinger's use of the taser to "seize" Ickes was constitutionally "unreasonable." *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004).

A local governing body is liable under § 1983 for constitutional injuries caused by the implementation or execution of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. "Similarly, an act

---

[14] The Court acknowledges that Ickes cannot recover damages from Bedford without establishing that Kinsinger violated his Fourth Amendment rights. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)(*per curiam*). Nevertheless, the fact that Kinsinger is entitled to qualified immunity does not necessarily mean that his actions were constitutional. *Brosseau v. Haugen*, 543 U.S. 194, 198-201, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)(*per curiam*).

performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Board of County Commissioners v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). "[A] municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Id.* at 403. Instead, a municipality is legally responsible only for its own illegal actions. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Where a plaintiff alleges that a municipality has caused a municipal employee to inflict a constitutional injury, "stringent standards of culpability and causation must be applied" to ensure that the municipality is not subjected to liability solely because it happens to employ the offending individual. *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997).

Ickes does not contend that Bedford's taser policy directed Kinsinger to deploy the taser at the time of the arrest. Indeed, he argues that Kinsinger *violated* Bedford's policy by using the taser. ECF No. 47 at 8. Thus, his claim against Bedford does not rest on an official policy adopted by municipal authorities. *Monell*, 436 U.S. at 690. The claim must therefore be grounded in the notion that Kinsinger violated Ickes' Fourth Amendment rights pursuant to a Bedford "custom" that was "so widespread as to have the force of law." *Brown*, 520 U.S. at 404.

Ickes bases his claim against Bedford on the idea that Kinsinger did not receive adequate training as to when a taser could be properly used to subdue a fleeing suspect. ECF No. 47 at 7-9. In *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court declared that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons

with whom the police come into contact." Elaborating on this standard, the Supreme Court explained:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Harris*, 489 U.S. at 390 (footnotes omitted). A plaintiff seeking to hold a municipality liable under § 1983 in this context "must demonstrate that a municipal decision reflect[ed] deliberate indifference to the risk that a violation of a *particular constitutional or statutory right* [would] follow the decision." *Brown*, 520 U.S. at 411 (emphasis added). He or she must also show that there was a "direct causal link" between the municipal decision at issue (*i.e.*, the decision not to properly train employees) and the constitutional or statutory violation for which redress is sought. *Id.* at 404.

As noted earlier, the Fourth Amendment limits the circumstances in which a police officer may lawfully employ deadly force to "seize" a fleeing suspect. *Garner*, 471 U.S. at 3. Alluding to the constitutional limitations on the use of deadly force in *Connick v. Thompson*, ___U.S.___, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011), the Supreme Court observed:

> Armed police must sometimes make split-second decisions with life-or-death consequences. There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require. Under those circumstances there is an obvious need for some form of training.

*Connick*, 131 S.Ct. at 1361. Where training is obviously necessary to prevent officers from infringing a particular constitutional right, a municipality's decision not to provide such training essentially amounts to a decision by the municipality itself to violate the Constitution. *Id.* at 1365. A plaintiff seeking to recover damages from a municipality under this theory must establish that "the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights" that the municipality's "failure to respond amount[ed] to deliberate indifference." *Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir. 2001).

It is undisputed that Kinsinger received training related to the proper use of a taser on July 31, 2007. ECF Nos. 43 & 49 at ¶ 88. When questioned about the training, Sigler testified that he had instructed Bedford's police officers to generally follow a "use-of-force continuum" while trying to apprehend a suspect. ECF No. 39-15 at 20; Sigler Dep. at 77-80. In response to questions posed by Ickes' counsel, Sigler testified as follows:

Q.    And can you tell me what training you provided in July of 2007 that was outside of the taser manual connected with the use-of-force continuum?

A.    Was my recommendation on the steps to be taken on the continuum force, use-of-force, which was officer presence, verbal commands, taser, and deadly force.

Q.    Officer presence, verbal command, taser, and deadly force?

A.    Yes. There's hand controls or whatever they call, soft hands techniques.

Q.    And you instructed on those in July of 2007?

A.    Instructed, that is what was instructed.

Q.    All right. So you essentially said your use-of-force continuum to the officers is officer presence, verbal command, taser, and deadly force, and then you added hands, the use of hands?

A.    Yes, that was all part of the same. But use of hands, not the last one.

Q.   I understand.  But I am saying you added that after you initially gave me that first string?

A.   Yeah.  I inadvertently forgot that step.

Q.   Does that follow between verbal command and taser or officer presence and verbal commands?

A.   I place it between taser and deadly force.

Q.   The use of hands?

A.   Uh-huh.

Q.   So you consider the use of hands to control the subject to be a greater force than the use of the taser?

A.   My recommendation on all of this is about safety, to be out of the 21 foot zone that is considered to be safe approaching a subject.

Q.   Back to my question, so you are saying that your use of force policy recommendation to your officers would be that they would use the taser before they could get close enough to use their hands?

A.   Yes.

Q.   Okay.  And the hand techniques that you are referring to would be what?

A.   Physically striking someone, you know, getting in a confrontation physically with an individual.

Q.   Well, you don't necessarily have to strike someone to subdue them with your hands; do you?

A.   Not necessarily, no.

Q.   I thought we saw a reference to wrist controls, things like that?

A.   Yes.

Q.   Those are hand techniques; right?

A.   My point exactly.  You have to be close to the subject not knowing whether they have any weapons or, and each incident is different.

ECF No. 39-15 at 20; Sigler Dep. at 78-80. According to Ickes, Sigler's instruction that an officer deploy a taser before using his or her hands to subdue a suspect was contrary to Bedford's written taser policy. ECF No. 47 at 8. Ickes contends that this alleged training defect caused Kinsinger to violate his Fourth Amendment rights. *Id.*

The argument advanced by Ickes is unavailing for three reasons. First of all, the portion of the Bedford policy relied upon by Ickes simply forbids the deployment of a taser against "a handcuffed or secured prisoner, absent overtly assaultive behavior that cannot be reasonably dealt with in any other less intrusive fashion." ECF No. 39-16 at 2; Taser Policy, § B(i)(b). It does not specify where the use of a taser falls on the use-of-force continuum. Second, a violation of Bedford's taser policy does not necessarily constitute a violation of the Fourth Amendment. *Moore*, 553 U.S. at 168-178. Unlike the policies of specific governmental entities, which inevitably "vary from place to place and from time to time," the objective reasonableness required under the Fourth Amendment applies equally from one jurisdiction to the next. *Whren*, 517 U.S. at 815. In order to hold Bedford liable for the constitutional violation allegedly committed by Kinsinger, Ickes must show that Bedford was deliberately indifferent to the risk that a violation of the *particular constitutional right* at issue would result from its training regimen. *Brown*, 520 U.S. at 411. It is not enough for him to demonstrate that Sigler's instructions exhibited a "deliberate indifference" as to whether Bedford's own internal requirements would be followed. *Collins v. City of Harker Heights*, 503 U.S. 115, 123-124, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Finally, it is undisputed that Kinsinger attempted to apprehend Ickes with his hands *before* using the taser. ECF Nos. 43 & 49 at ¶ 44. Even if it is assumed that Sigler's instructions were erroneous (and that they were likely to cause Bedford's officers to use their tasers prematurely), Kinsinger did not follow those instructions when he

arrested Ickes. Instead of tasering Ickes before engaging him with his hands, Kinsinger attempted to make the arrest with his hands (and sustained a minor injury to his right hand) before deploying the taser. ECF No. 39-7 at 21; Kinsinger Dep. at 81-83; ECF No. 39-9 at 3; Corrie Dep. at 11-12. Under these circumstances, there is no conceivable way that Ickes can establish that Sigler's statements pertaining to the use-of-force continuum "actually caused" Kinsinger to violate the Fourth Amendment.[15] *Connick*, 131 S.Ct. at 1358.

Ickes' attempt to categorically require arresting officers to make contact with their hands before deploying tasers against resisting suspects has no basis in constitutional law. The Fourth Amendment's standard of objective reasonableness cannot be reduced to a series of inflexible rules. *Scott*, 550 U.S. at 383 ("Whether or not Scott's actions constituted application of 'deadly force,' all that matters is whether Scott's actions were reasonable."). Like other citizens, police officers are entitled to take "reasonable" measures to protect themselves from harm. *Hassan v. City of Minneapolis*, 489 F.3d 914, 919-920 (8th Cir. 2007). Sigler's suggestion that an arresting officer may need to use a taser before making contact with a resisting suspect cannot be fairly construed as an invitation to police officers to use excessive force. *Connick*, 131 S.Ct. at 1365. As noted earlier, a taser can sometimes be used to prevent a "physical struggle" from escalating into an altercation that would be even more injurious to a resisting arrestee. *Draper*, 369 F.3d at 1278.

A plaintiff seeking to hold a municipality liable under § 1983 must "show that the [challenged] municipal action was taken with the requisite degree of culpability" and "demonstrate a direct causal link between the municipal action and the deprivation of federal

---

[15] In his expert report, Dr. McCauley faulted Bedford for not conducting an internal affairs investigation *after* Kinsinger arrested Ickes. ECF No. 47-20 at 16-19. For obvious reasons, conduct occurring subsequent to the arrest cannot be said to have *caused* the arrest. *Carswell v. Borough of Homestead*, 381 F.3d 235, 244-245 (3d Cir. 2004).

rights." *Brown*, 520 U.S. at 404. Ickes cannot surmount either of these hurdles.[16] Consequently, the Court will grant the motions for summary judgment filed by Kinsinger and Bedford. ECF Nos. 39 & 84.

**D.    The Claims Against Reichelderfer, Burkey and Nelson**

After learning that Ickes was moving throughout the courthouse with a tape recorder, Reichelderfer contacted Kinsinger and asked him to investigate the matter. ECF No. 39-8 at 5; Reichelderfer Dep. at 19-20. When Kinsinger arrived at the courthouse, Burkey identified Ickes and quickly left the area. ECF No. 39-4 at 3-5; Burkey Dep. at 12-19. Neither Reichelderfer nor Burkey was present when Kinsinger arrested Ickes.

Relying on *Thompson v. Wagner*, 631 F.Supp.2d 664 (W.D.Pa. 2008), Ickes contends that liability under § 1983 for an unlawful arrest can extend to those whose actions set the arresting officer in motion. ECF No. 47 at 11. In *Thompson*, this Court observed:

> [T]he Supreme Court has explained that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Since the common law recognized a "causal link" between the submission of a criminal complaint against an individual and an ensuing arrest of that individual, § 1983 has been construed to recognize that same causal relationship. *Malley v. Briggs*, 475 U.S. 335, 344, n. 7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). For this reason, it is clear that "a government official's liability for *causing* an arrest is the same as for carrying it out," and that "§ 1983 liability for an unlawful arrest can extend beyond the arresting officer to other officials whose intentional actions set the arresting officer in motion." *Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000)(emphasis added).

*Thompson*, 631 F.Supp.2d at 673. The reasoning employed in *Thompson*, however, provides no basis for permitting Ickes to proceed with his claims against Reichelderfer and Burkey.

---

[16] Since Ickes' official-capacity claims against Kinsinger are the functional equivalent of his claims against Bedford, they must be dismissed for the same reasons. *Kentucky v. Graham*, 473 U.S. 159, 165-166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

First of all, neither Reichelderfer nor Burkey filed a criminal complaint against Ickes or asked that he be arrested. Kinsinger testified that Ickes may not have been arrested if he had turned his tape recorder off when ordered to do so. ECF No. 39-7 at 19; Kinsinger Dep. at 74-75. Regardless of whether Kinsinger's understanding of the Wiretap Act was correct, Ickes was arrested for his refusal to comply with Kinsinger's request. ECF No. 47-2 at 3. He was not arrested because of conduct occurring prior to Kinsinger's arrival. Furthermore, Ickes' remaining claims pertain to the *manner* in which he was arrested rather than to whether Kinsinger was justified in making the arrest in the first place. *Graham*, 490 U.S. at 395 (explaining that "the 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out")(emphasis in original). Even if the Court were to assume (contrary to the evidence) that Reichelderfer and Burkey *caused* Ickes to be arrested, their actions would still be a step removed from Kinsinger's intervening decision to deploy the taser while making that arrest. The "causal link" discussed in *Thompson* cannot be stretched as far as Ickes suggests.[17] *Thompson*, 631 F.Supp.2d at 673.

In his expert report, Dr. McCauley suggested that Kinsinger would not have deployed the taser against Ickes if Nelson had immediately announced his arrival at the scene. ECF No. 47-20 at 12. Such a failure to follow proper procedures, however, cannot be equated with a Fourth Amendment violation. *Whren*, 517 U.S. at 815. The United States Court of Appeals for the Third Circuit has recognized that a police officer who witnesses a Fourth Amendment violation and refuses to intervene may be held liable under § 1983 for damages resulting from that violation. *Baker v. Monroe Township*, 50 F.3d 1186, 1193-1194 (3d Cir. 1995). This rule of law is based on the idea that "[t]he approving silence emanating from the officer who stands by and watches as others unleash an unjustified assault contributes to the actual use of excessive force."

---

[17] Ickes appears to concede that he has no viable cause of action with respect to Burkey. ECF No. 47 at 10.

*Smith v. Mensinger*, 293 F.3d 641, 651 (3d Cir. 2002). An officer who passively observes a constitutional violation, however, is liable only where he or she declines "a realistic and reasonable opportunity to intervene." *Id.* "Given the quick sequence of events" at issue in this case, no reasonable trier of fact could conclude that Nelson had "a realistic and reasonable opportunity" to prevent Kinsinger from using the taser. *Stewart v. Moll*, 717 F.Supp.2d 454, 463 (E.D.Pa. 2010). The events surrounding Ickes' arrest were simply too momentary to trigger Nelson's duty to intervene. *Baker*, 50 F.3d at 1194 (permitting a failure-to-intervene claim to proceed against an officer who had been aware that the plaintiffs were being treated unlawfully but had nevertheless "permitted that treatment to continue for some amount of time" before acting to stop it).

For these reasons, Ickes cannot proceed with his claims against Reichelderfer, Burkey and Nelson. The motion for summary judgment filed by these three defendants will be granted. ECF No. 40. The Court expresses no opinion as to whether these individuals correctly understood the scope of the Wiretap Act.

**E.    The Extraneous Evidence**

Officer Stephen Kagarise ("Kagarise") transported Ickes from the Bedford Borough Police Station to an arraignment hearing before a District Justice. ECF No. 47-20 at 5. Along the way, Kagarise briefly stopped at the University of Pittsburgh Medical Center's Bedford Memorial Hospital ("UPMC Bedford") because Ickes had complained of breathing difficulties. *Id.* After arriving at UPMC Bedford, Kagarise apparently determined that Ickes was not in need of medical attention and proceeded to drive him to the hearing. *Id.* Employees of the Bedford County Jail later concluded that Ickes was in need of medical attention and authorized his admission to UPMC Bedford. *Id.* Ickes was hospitalized for five days. ECF No. 47-18.

In his report, Dr. McCauley opined that Kagarise had acted improperly by failing to have Ickes evaluated by medical personnel prior to the hearing. ECF No. 47-20 at 13-14. Ickes testified that, during the course of the hearing, Kagarise had forced him to sign a document by "twisting" his handcuffs. ECF No. 39-3 at 19; Ickes Dep. at 74-76. The event was described as a "painful" experience. *Id.* The Court acknowledges that the authorities responsible for Ickes' detention were constitutionally required to ensure his safety and address his medical needs. *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244-246, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). Kagarise, however, is not a defendant in this action. Ickes' claims against Bedford relate solely to the conduct of Kinsinger. ECF No. 15 at ¶¶ 36-43. Therefore, the legality of Kagarise's conduct is simply not germane to the Court's analysis.

Ickes testified that a female nurse had forcibly inserted a catheter into his penis while he was handcuffed to a hospital bed. ECF No. 39-3 at 20; Ickes Dep. at 78-80. He stated that the nurse had invited a female security guard to watch the procedure. *Id.* When asked whether any Bedford police officers had been involved in the incident, Ickes was unable to provide a clear answer. *Id.* These allegations undoubtedly raise legal concerns. *Sell v. United States*, 539 U.S. 166, 176, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003)(remarking that "involuntary medical treatment raises questions of clear constitutional importance"); *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990)(explaining that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment"); *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995)(stating that, under the Fourth Amendment, prisoners "retain a limited constitutional right to bodily privacy, particularly as to searches viewed or conducted by members of the opposite sex"); *Tinius v. Carroll County Sheriff Dept.*, 321 F.Supp.2d 1064, 1073-1079 (N.D.Iowa 2004)(recognizing state actors' assistance in

effecting an involuntary catheterization as a "seizure" subject to the Fourth Amendment's standard of objective reasonableness); *Valles v. Albert Einstein Medical Center*, 805 A.2d 1232, 1237 (Pa. 2002)(describing "an operation performed without the patient's consent" as a "technical assault" that "sounds in the intentional tort of battery"). Nevertheless, the record contains no evidence suggesting that Ickes' alleged mistreatment at UPMC Bedford was caused by the actions of the personal-capacity defendants named in this action or the application of a policy or custom attributable to Bedford. Consequently, the Court has no occasion to consider whether Ickes' legal rights (under the Constitution or otherwise) were violated during the course of his hospitalization. At this juncture, it suffices to say that Ickes cannot proceed with his constitutional claims against Bedford and the four personal-capacity defendants.

## VI. CONCLUSION

Ickes consents to the dismissal of his false arrest claims "without prejudice." ECF No. 47 at 3. While reasonable individuals (*e.g.*, the authors of the expert reports submitted by the parties) may differ as to whether Kinsinger's use of the taser to subdue Ickes constituted "excessive force," the state of the law was not sufficiently clear to put Kinsinger on notice that his conduct was objectively unreasonable. *Brosseau*, 543 U.S. at 199-201. Therefore, Kinsinger is entitled to qualified immunity regardless of whether his actions were unconstitutional. *Id.* Even if Kinsinger violated Ickes' Fourth Amendment rights by deploying the taser, Ickes cannot satisfy the "stringent standards of culpability and causation" necessary to hold Bedford liable for his injuries. *Reitz*, 125 F.3d at 145. Reichelderfer and Burkey were not present when Ickes was arrested and, hence, had no control over *how* the arrest was carried out. *Graham*, 490 U.S. at 395. Although Nelson arrived on the scene while Kinsinger was still attempting to apprehend Ickes, he had no "realistic and reasonable opportunity to intervene" before the taser was

deployed. *Smith*, 293 F.3d at 651. Accordingly, the motions for summary judgment filed by the Defendants will be granted. The Court expresses no opinion as to whether Kinsinger had probable cause to arrest Ickes for violating the Wiretap Act, or as to whether he violated Ickes' Fourth Amendment rights by using the taser.

**AND NOW**, this ___9th___ day of ___August___, 2011, this matter coming before the Court on the Motion for Summary Judgment filed by Defendants Kinsinger and Bedford (*ECF No. 39*), the Motion for Summary Judgment filed by Defendants Nelson, Reichelderfer and Burkey (*ECF No. 40*), and the Supplemental Motion for Summary Judgment filed by Defendants Kinsinger and Bedford (*ECF No. 84*), IT IS HEREBY ORDERED that the three Motions for Summary Judgment are **GRANTED**. IT IS FURTHER ORDERED that Plaintiff Ickes' "excessive force" claims are dismissed **WITH PREJUDICE**, and that his "false arrest" claims are dismissed **WITHOUT PREJUDICE**.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**

cc:     All counsel of record